AO 91 (Rev. 11/82)                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | FILED CLERK, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

UNITED STATES OF AMERICA
v.
STEVE GOLDEN

DOCKET NO.
MAY 3 1 2013

CENTRAL DISTRICT OF CALIF.
BY _____ DEPUTY

MAGISTRATE'S CASE NO.

**13-1499M**

Complaint for violation of Title 18, United States Code, Sections 2252A(a)(2), (b)(1); 2252A(a)(5)(b), (b)(2)

| NAME OF MAGISTRATE JUDGE HONORABLE MICHAEL R. WILNER | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

COUNT ONE
[18 U.S.C. §§ 2252A(a)(2), (b)(1)]

Between on or about April 10, 2013 and May 30, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant STEVE GOLDEN, also known as "isskalev@gmail.com," knowingly attempted to receive and received child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that had been mailed, and shipped and transported using any means or facility of interstate and foreign commerce, and in and affecting interstate and foreign commerce by any means, including by computer, knowing that the images were child pornography.

COUNT TWO
[18 U.S.C. §§ 2252A(a)(5)(b), (b)(2)]

On or about May 30, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant STEVE GOLDEN, also known as "isskalev@gmail.com," knowingly possessed USB hard drives which contained at least one image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that had been mailed, and shipped and transported using any means or facility of interstate and foreign commerce and in and affecting interstate and foreign commerce, by any means, including by computer, and produced using materials that had been had been mailed, and shipped and transported in and affecting interstate and foreign commerce, by any means, including by computer, knowing that the images were child pornography.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT – Lyndon Versoza |
|---|---|
| | OFFICIAL TITLE Special Agent – USPIS |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) MICHAEL R WILNER | DATE May 31, 2013 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Joey L. Blanch, x3315          REC: Detention

## AFFIDAVIT

I, Lyndon Versoza, being duly sworn, depose and state:

## I. INTRODUCTION

1.   I am an Inspector with the United States Postal Inspection Service ("USPIS") assigned to the Los Angeles Division, in Los Angeles, California.  I have been so employed since 2005.  As a United States Postal Inspector assigned to investigate child exploitation matters, I am responsible for the investigation of federal offenses involving the possession, receipt, distribution, transportation, and/or sale of child pornography through the U.S. mails, in violation of Title 18, United States Code, Sections 2252 and 2252A.  In this capacity, I have received extensive training, both formal and informal, relating to child exploitation investigations, including, without limitation, the 12-week USPIS academy where I learned to investigate various crimes, including those relating to the exploitation of children.  Last year, I attended a weeklong "Crimes Against Children" seminar where, among other things, I learned about the behavioral psychology of sex offenders, computer forensics, and the investigation of child predators.  I also have participated in the execution of numerous search warrants and investigations relating to child pornography.

2.     Prior to my service as a Postal Inspector, I was employed, for approximately three years, between 2002 and 2005, by the Immigration and Naturalization Service (later, the Customs and Border Protection) as a federal law enforcement officer.  For three years prior to joining law enforcement, I worked in the field of visual arts media.  Specifically, I spent one year doing an internship for a museum developing a website and administrating its web server, after which I spent two years working for a different museum where I edited and developed video content.

II. **PURPOSE OF AFFIDAVIT**

3.     This affidavit is made in support of a criminal complaint and arrest warrant charging STEVE GOLDEN ("GOLDEN") with violations of Title 18, United States Code, Section 2252A(a)(2)(A), (b)(1): Receipt and Attempted Receipt Child Pornography and Section 2252A(a)(5)(B): Possession of Child Pornography.[1]

---

[1] "Child Pornography" is defined for § 2252A in § 2256(8) as any visual depiction, including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct involving the use of a minor engaged in said conduct.  "Sexually explicit conduct" is defined for § 2252A in § 2256(2) and includes sexual intercourse, including oral-genital or anal-genital, whether between persons of the same or opposite sex, or the lascivious exhibition of the genitals or pubic area of any person.

4.    The statements contained in this affidavit are based upon my training and experience, victim and witness interviews, financial records, social media communications, conversations with other inspectors, agents and other sources.  This affidavit is intended to show that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all my knowledge of, or investigation into, this matter.

III.   BRIEF SUMMARY

5.    As set forth in detail below, in or about April, 2013, GOLDEN attempted to purchase a child pornography video from a catalog; unbeknownst to him, the "catalog" was an undercover USPIS operation.  On May 30, 2013, law enforcement went to GOLDEN's home.  GOLDEN consented to be interviewed.  In a post-Miranda, recorded interview, GOLDEN admitted to attempting to purchase the child pornography from the undercover operation and also admitted that he currently possessed a large child pornography collection which he had downloaded via the Internet. Furthermore, during a second interview, GOLDEN admitted that he molested at least two young girls, possibly more, and was worried that he might molest a child again.  He stated that he regularly walks by a school and watches the young girls playing; he said that he did not want to "hurt" them, but he was afraid that he might do so.  GOLDEN consented to a search of his residence and digital material; child pornography was found.

IV. <u>PROBABLE CAUSE</u>

6.    Much of the information contained below, I obtained through the course of multiple conversations with USPIS Inspector Paul Suboyu throughout May, 2013.

A. <u>In 2011, GOLDEN Ordered a Child Pornography Catalog from an Undercover Postal Operation</u>

7.    On or about October 2011, as part of a separate investigation, Steve GOLDEN was identified as having U.S. Mail correspondence with a business that operated an internet "nudist" website.  In addition to nude adults, the website depicted, and made available to view online via the Internet, many nude images and movies of pre-pubescent and adolescent minor children.  Additionally, the company offered for sale, via U.S. Mail, many DVD movies featuring nude pre-pubescent and adolescent minors.

8.    On or about November 28, 2011, while acting in an undercover capacity, Inspector Suboyu mailed an undercover advertisement to GOLDEN's residence in Van Nuys, California. This address was identified as having correspondence with the aforementioned business.  Due to the ongoing investigative activity of this USPIS undercover operation, the identity of the undercover operation will be referred to as the "UC Operation." The mailed advertisement contained an undercover name and address and invited individuals to become "…a customer of [the

4

UC Operation]," with an invitation to request a free specialty catalog specific to the customer's "desires."  Included in the advertisement was a checklist for the following types of catalogs the customer could request:  Bestiality, Scat, Water Sports (piss fun), Pre Teen Boys, Pre Teen Girls, Young Teen Boys (13-16), Young teen Girls (13-16), Torture & Rape, Fisting & Objects, Incest & Family Love (adult or Pre & Young Teen), Up Skirt, and Hidden Camera & Voyeur.  Also included in the advertisement was a section for the customer to fill in their name, address, and e-mail address.

9.  On or about January 4, 2012, Inspector Suboyu received, via U.S. Mail, an envelope addressed to the UC Operation.  The return address on the envelope was GOLDEN's residence in Van Nuys, and had a postmark date of December 12, 2011.  The envelope contained the completed catalog request form of the undercover advertisement.  The sender of the letter identified himself as "Steve Golden."  As set forth below, GOLDEN has admitted that he was the individual who corresponded with the UC Operation.  GOLDEN indicated on the returned checklist that he wanted to receive a catalog for the following videos:

a.  GOLDEN checked the box indicating that he wished to receive a catalog for videos featuring "Pre Teen Girls." Further, GOLDEN handwrote beside the Pre Teen Girls box "no man + girl please/LS island magazine videos are a plus."  I know

5

from my training and experience that "LS island" was one of the monikers under which a Ukraine soft core child pornography studio marketed its images; these images often feature sexualized "modeling"-type images of young girls, often in nude or semi-nude.

b.    GOLDEN checked to box indicating he was also interested in "Incest & Family love," specifically indicating an interest in "Pre & Young Teen";

c.    GOLDEN checked the box indicating "Up Skirt," and handwrote beside the box "Preteen Girls Only";*

d.    GOLDEN checked the box for interest in "Hidden Camera & Voyeur" and handwrote beside the box "Preteen Girls only."

e.    GOLDEN also handwrote on the form that he was interested in "Preteen Girls—Asian, (not dyed) natural blondes, red-haired preteen girls, (African) black preteen girls naked + masturbation."

10.    GOLDEN indicated on the form that he was interested in "Buying."  He provided his true name and address as his mailing address, and also provided the email address isskalev@gmail.com ("GOLDEN's Email Address").

B. **In April-May 2013, GOLDEN Purchased and Received a Child Pornography Video from the Undercover Postal Operation**

11.   On or about January 11, 2012, in response to the request for a catalog from the UC Operation, acting in an undercover capacity, Inspector Suboyu mailed GOLDEN a reply to his home in Van Nuys.  Inspector Suboyu's response included catalog listings of available videos in the specific content areas in which GOLDEN had indicated an interest.  The catalog sent to GOLDEN made it clear that the content of the videos available for purchase was child pornography.  The catalog explicitly stated that "All movies are original home made amateur movies, are of excellent quality & have sound!  All titles are available in DVD.  YOUNG TEEN & PRE TEENS & INCEST/FAMILY LOVE (all ages are real!! We do not use actors!!)".  Further, the descriptions of available videos graphically described the contents of the videos as child pornography.  For instance, movie #16, titled "Very Young Sex Bonanza," was ultimately ordered by GOLDEN (see below).  The catalog description of this movie was:

> "Incest sister love! 14 yr old & 9 yr old sisters play with each others pussy with dildo..10 yr old boy fingers mom and sis..Lots of sister sex, fucking sucking and jerking off with dad and his three girls ages 8, 9, and 14 years old and one 10 year old boy. Sisters and mom jerk off & suck little boy!!"

12.   The order form listed the price for DVDs as $25 USD (cash, check, or money order) each, with free worldwide shipping included and included an e-mail address used for the undercover operation.  The order form instructed the customer to fill in their name, address, e-mail address, computer operating system, movie number, movie title, total movies purchased, total amount enclosed, a signature and date, and to mail the completed form to the undercover operation.

13.   The order form sent to GOLDEN by Inspector Suboyu made it very clear that the material offered by the catalog was illegal in the United States.  Specifically, the order form stated that "All orders are sent very discreetly and will be plainly marked.  These movies are forbidden in the USA, Canada and many other parts of the world.  [UC Operation name] will keep no copies of this transaction. By signing below, you certify that you do not work for Interpol or any government agency and that you will not hold [UC Operation name] responsible for any violation of law.  You will also agree not to copy or sell these movies or report any information to the authorities."

14.   The order form allowed the customer to "Check here if you would like to receive a complete catalogue of all forbidden movies available."  The video catalog

listings included video titles and descriptions from the requested categories.  A selection of approximately 10 movie titles were listed, all of which described scenes of sexually explicit conduct involving minors.

15.  The materials sent to GOLDEN by the UC Operation contained an undercover email address to which customers could address correspondence regarding their interest in the child pornography.  On or about January 30, 2012, GOLDEN used the GOLDEN Email Address to send an email to the UC Operation, further detailing the type of child pornography in which he was interested.  Specifically, the e-mail bore the subject line of "did you read the notes?" and the message read:

> "When I sent in the form you sent me originally, I specifically requested no man+girl.  Did you not read the notes I wrote? I'll simplify the video requests, prepubescent girls stripping and/or masturbating. Thnx."

16.  On or about March 7, 2012, GOLDEN used the GOLDEN Email Address to send another communication to the UC Operation, indicating that he had lost the list, describing DVDs available for sale, and requesting a new list. Specifically, the subject line read "Lost dvd list" and the message read:

> "First, I'd like to apologise for the last e-mail I sent. It was unprofessional. You don't need me give you an attitude. If you can I need a list of dvds like

9

the last one you sent me. I misplaced the original.
Thank you for your time and consideration.

    Steve"

17.  Throughout April 2012, GOLDEN persisted in his
request for a replacement list.  The email communications
between GOLDEN (using the GOLDEN Email Address) and
Inspector Suboyu (in an undercover capacity) include the
following:

    a.   On or about April 10, 2012, GOLDEN emailed:
"Greetings, I was wondering when I can expect
the replacement list of dvd titles to arrive. I
have the order form but not the list of dvd
titles.  Thanks for responding to my last
email.  Steve"

    b.   On or about April 12, 2012, Inspector Suboyu
emailed: "it is attached to the order form."

    c.   On or about April 14, 2012, GOLDEN emailed:
"The dvd list got separated and lost after it
arrived, I don't know what I did with it, but
it is lost. That's why I need a replacement.
Thanks"

    d.   On or about April 19, 2012, Inspector Suboyu
emailed: "kindly let me know if you receive
this."

    e.   On or about April 21, 2012, GOLDEN emailed:
"Yes, I received your message/email. I have an
idea maybe you send a copy of the list of dvds
to my email. It would probably be faster and
cheaper then mailing another list."

    f.   On or about April 23, 2012, Inspector Suboyu
emailed: "i included the list as a text on the
attachemnt. Did you not see it?"

10

g.    On or about April 23, 2012, GOLDEN replied:
Unfortunatly no, that's really weird that it
didn't show up."

h.    On or about April 24, 2012, Inspector Suboyu
emailed GOLDEN the catalog described above as
text in the message.  He also stated: "For some
reason the file did not attach. Kindly let me
know if you receive this email and the
attachment. If you do not, let me know your
address again and I will mail to you the
catalog. With your first purchase the entire
list of movies will be provided to you so all
you will have to do is reference the movie
number. Warm regards, [UC Operation]"

i.    On or about April 26, 2012, GOLDEN emailed:
"Yes, I received the file with the info this
time around. Thank you very much. As soon as I
can save up $25.00, I'll sent you the money
order and the all the other necessary info.
Again, thank you very much for the help.
Steve"

j.    On or about April 27, 2012, Inspector Suboyu
emailed:  "Ok, sounds wonderful.  Earnestly
Yours,  [UC Operation]"

18.   About a year later, GOLDEN ordered a child

pornography DVD from the UC Operation.  On or about April 12,

2013, GOLDEN used the U.S. mail to send the completed movie

order form to the address listed on the advertising materials

for the UC Operation.[2]  The order form contained a hand

printed return address bearing GOLDEN's true name and address.

In the "Please send to me the following movies" section,

---

[2] The order was received by Inspector Suboyu on or about April 29,
2013.  It was postmarked April 12, 2013.

GOLDEN had written: "#16 -    Very Young Sex Bonanza.[3]"
GOLDEN also included a handwritten a request for additional
listings of child pornography featuring preteen girls.
Specifically, he wrote:  "(side note) if your company has any
new preteen girl movies, please send list. Thank you." This
message ended with GOLDEN's drawing of a "smiley face."

19.  The completed and signed order form was signed
"Steve Golden" and dated "4/10/13."  It was mailed to the UC
Operation in an envelope bearing GOLDEN's true name and
address on the return label.  The envelope included $25 in the
form of a Western Union Money Order.  The money order was
written out to the UC Operation, and listed GOLDEN's address
as the "purchaser's address."  Where the money order listed
"Purchaser's Signature," GOLDEN had signed his true name.  I
have compared this signature with GOLDEN's signature on his
DMV records, and it appears to be the same.

---

[3] As set forth above, the catalog description of this
video made it clear that it contained child
pornography, advertising: "Incest sister love! 14 yr
old & 9 yr old sisters play with each others pussy
with dildo..10 yr old boy fingers mom and sis..Lots of
sister sex, fucking sucking and jerking off with dad
and his three girls ages 8, 9, and 14 years old and
one 10 year old boy. Sisters and mom jerk off & suck
little boy!!"

20.   On or about April 21, 2013, GOLDEN followed up his mailed order with an email to the UC Operation.  Using the GOLDEN Email Address, he sent Inspector Suboyu a message with the subject line "Re: thank you very much."   The message stated:

> "I've sent a order form and $25 money order for video 16 (I think it's 16).  Anyhoo, I hope your receive it soon. If it doesn't arrive by end of this month let me know. Hopefully it didn't get intercepted, that would be bad for both of us.
>
> Steve"

21.   On or about May 10, 2013, GOLDEN followed up again, checking on his child pornography order to ensure that it was mailed to an address where he would be living.  Using the GOLDEN Email Address, GOLDEN sent Inspector Suboyu an email that read:

> Will the video be arriving this month or next month? If it's next mnth, I'll have to forward you my new mailing adress since I'm moving in June.  Please respond to this message as soon as you can.  Thank you."

22.   GOLDEN used his true address when attempting to order child pornography.  The postal carrier for that address confirmed that he/she delivers mail to GOLDEN at that address, and the landlord confirmed that GOLDEN lived there.

23.   On May 30, 2013, as part of the UC Operation, Postal Inspector Lynette Thompson dressed as a USPS letter carrier and delivered a parcel ostensibly containing GOLDEN's child

13

pornography order.  The package was delivered to GOLDEN's home

in Van Nuys – the address to which he had requested his child

pornography purchase be delivered.  The packaged contained child

pornography on a DVD.[4]  After Inspector Thompson delivered the

parcel, GOLDEN signed for it.  Inspector Thompson told me that

GOLDEN appeared excited to receive it.

24.  Approximately 20 minutes after the package was

delivered, Postal Inspector Eula Toca and I went to GOLDEN's

apartment and knocked on the door.  GOLDEN answered.  We

identified ourselves as Postal Inspectors and showed him our

badges and credentials.  Before I asked him anything else,

GOLDEN said, "here it is, I ordered it but I was just trying to

see if it was real."  He then handed me the unopened parcel from

the undercover operation.  I told him that I wanted to talk to

him about it and asked if Inspector Toca and I could come

inside.  He consented and allowed us into the apartment.

GOLDEN's mother, who also lives at that address, was initially

present.  After GOLDEN invited us into the apartment, however,

GOLDEN asked her to go to her room and she complied.

---

[4] Although the DVD contained child pornography, this material
remained under the control of law enforcement at all times,
because the child pornography file was encrypted.  It could not
be accessed without a password, which was never provided to
GOLDEN.  In this way, we ensured that GOLDEN could not view the
child pornography, copy it, upload it to the Internet, etc.

25.   Once GOLDEN's mother left the room, he repeated that he had ordered the parcel and said that we should take him to jail. He put his wrists together as if he were asking to be handcuffed.  I told him we were not there to arrest him but I wanted to talk to him.  He consented.  I also asked him if we could have his consent to search his apartment.  He pointed toward the TV and said the "junk" we would want will be in the area he pointed.  He then reached over toward the TV and grabbed a "USB drive".  I provided him with a USPIS "Consent to Search" from.  I asked him to read it, and fill out his name.  I also read it aloud to him.

26.   GOLDEN consented and signed the form.  I called other Postal Inspectors and CHP Investigator Sergio Perez, who were waiting down the hall outside and hidden out of view from GOLDEN's apartment.  GOLDEN allowed them to come in.  GOLDEN saw them and again put his wrist together as though asking to be arrested, and again asked to be arrested.  I told him they were there to search the apartment (to which he had already consented), but I wanted to talk to him.  He consented and told them where they might find child pornography and other items of interest.

27.   Because of clutter in the apartment, I asked GOLDEN if he would speak with me in my car, which was parked outside the apartment building.  He again consented to be interviewed.

Although GOLDEN was not under arrest at that time, out of an abundance of caution I gave him the Miranda warning, and he signed a written Miranda waiver.  This interview was recorded.

28.  During this interview, GOLDEN admitted that he was, in fact, the individual who ordered the child pornography video as described above.  He understood and believed that the video he ordered would contain real children, engaged in sexually explicit activity.  At one point during the interview, I connected my USPIS undercover laptop to the Internet.  He logged onto his email account – the GOLDEN Email Account – and showed me his email communications, which included his communications with the USPIS UC Operation.

29.  Based on the communications set forth above, there is probable cause to believe that GOLDEN attempted to receive child pornography.  By repeatedly requesting the child pornography catalog, selecting a child pornography video from that catalog, placing the order in the mail along with a money order for purchase price, requesting that the child pornography video be sent to his home, following up on the order with emails to ensure that he received the child pornography, and signing for and accepting the delivery of child pornography, GOLDEN took numerous substantial steps in his attempt to receive and actually receive child pornography.

C. **On May 30, 2013, GOLDEN Possessed Additional Child Pornography**

30.   When I interviewed GOLDEN on May 30, 2013, he admitted to me that he had a large collection of child pornography which he had downloaded from the Internet, and saved onto USB drives. He said he did not own a computer but used computers from the library and cafes to download child pornography.  He said that his public library account was eventually suspended, he assumed for the illegal activity.  GOLDEN stated that he viewed his child pornography about twice a week and masturbated to the images and videos.  He said that he especially liked child pornography involving masturbation.  His favorite child pornography involved young preteen girls on their back "spread-eagle."  (The term "spread-eagle" means a girl with her legs spread wide, exposing her genitals).

31.   After admitting to downloading child pornography from the Internet, GOLDEN gave me consent to take over his online identities.  He signed a written consent form and provided the passwords to me.  He also used my computer to show me the websites he frequented that contained child pornography.  GOLDEN told me that some of these sites were commercial sites that required him to use prepaid cards to pay for access to the child pornography.

32.   A full forensic exam of the digital devices taken from GOLDEN has not been completed.   However, an initial preview of the items has determined that numerous child pornography files are contained therein[5].   For instance, I have reviewed the following video files from one of GOLDEN's USB drives:

    a.   "va-daphne&irina.avi" is a video almost 8 minutes long, depicting two minor girls.   One is approximately nine or ten years old and one is approximately 12-14 years old.   The video depicts the younger girl masturbating herself with her fingers inside her genitals, then masturbating the second girl's genitals and breast.

    b.   "bd mag 9 1.07.avi" is a video almost 4 minutes long.   It depicts two girls, both approximately 10-13 years old.   Both girls are nude.   At various times in the video, each girl sits on a table with her legs spread to expose her genitals, while the camera zooms into her genitalia.   The girls also hold each other and appear to similate French kissing each other.

---

[5] On the initial preview of one USB drive, in addition to child pornography, I also found a folder labeled "Me." This folder contained a picture of GOLDEN; I recognize this photograph as one GOLDEN posted on his Facebook account.

c.    "Rosy-ruby-ria-papaya-pv.wmv" is a video
approximately 30 seconds long.  It depicts two
girls, approximately 8 and 12 years old.  The
video appears to be a short preview video and
shows the girls eating what appears to be papaya
off each other's bodies.  At one point, one of the
girls is shown licking papaya off the thigh of the
other, near her exposed vagina.  The video also
zooms in on one of the girls' panties being
squeezed between her labia.

33.  Based on my training and experience, I know that the
technology does not currently exist to digitally create moving
images of human beings that are not readily discernible from
real, actual, human beings. I have reviewed the videos described
above, and they appear to depict real children.  I saw no
indication that they had been digitally manipulated in any way.

34.  GOLDEN told me that he obtained his child pornography
from the Internet, which is a means and facility of Interstate
and foreign commerce.

D. GOLDEN Admitted to Molesting Two Children And To Being
   Afraid of Molesting More

35.  As set forth above, when GOLDEN was interviewed, he was
not under arrest.  After the interview was over, I gave GOLDEN
my contact information, and I left, as did the other law

enforcement personnel.  GOLDEN remained at his apartment.  About 30 minutes after we left, however, GOLDEN called me and said that he had more evidence related to child pornography that he wanted to turn over to me.  I agreed to go back to the apartment to pick up the additional evidence, but we did not agree on a specific time to meet.  GOLDEN called me again about 30 minutes later to ask when I would return, because he wanted to talk to me.  I agreed to return to GOLDEN's apartment immediately.

36.  Shortly thereafter, other postal inspectors and I soon returned to GOLDEN's apartment and found GOLDEN waiting outside his building.  He handed me a trash bag full of items and said he did not want to possess them.  I looked inside and found various materials including commercial books and movies.  GOLDEN said that even if they were not child pornography, he did not want to have them as they depicted children and "tempted" him.

37.  GOLDEN agreed to come with us to a USPIS office in Van Nuys to talk.  Before the interview, I again reminded GOLDEN of his Miranda rights.  GOLDEN said he understood his rights.  This second interview was also recorded.  GOLDEN is currently in his mid-thirties.  During the interview GOLDEN admitted to molesting at least two children.  His statements included the following:

a.  When GOLDEN was 14 years old, he began molesting a five-year-old girl.  The molestation continued for approximately four-to-five years, when the girl was

approximately 9-10 years old (which would make GOLDEN 18-19 years old). At that point, the girl moved away. GOLDEN said that he would put his hands between the girl's legs, under her clothes and underwear, and rub her genitals. He said it was not consensual; that the molestation occurred when the child was awake but that it did not appear the child enjoyed it.

b.   When GOLDEN was approximately 20 or 21 years old, he molested another five-year-old girl. He said he molested this child repeatedly for approximately a year. GOLDEN explained that he would rub her genitals underneath her panties while she was asleep. GOLDEN also said that he would sometimes see the child masturbating. He said that he would not engage sexually with her while she masturbated but he would watch her, then masturbated himself afterwards. I asked GOLDEN how such a young child knew how to masturbate. He said that he thinks that she may have learned it from his molestation.

c.   GOLDEN said that in his mid-to-late twenties he would hang out at the pool at an apartment where he previously resided. While there, he would secretly video record the genitals of minors in their bathing suits. He explained that older bathing suits were "see-through" and he could see the girl's genitals through them. He thinks those videos have been erased, but he was not certain.

d.   GOLDEN said that he would sometimes invite these minor girls from the pool into his apartment.  He said he was not sure if he molested any of them.  He said he may have sexually penetrated at least one of them, but was not certain.

38.  GOLDEN told me that he is not currently molesting any children.  However, he admitted to me that he regularly walks by a school in his neighborhood, and looks sexually at the young girls there.  While he emphasized that he does not want to hurt any of these children, he is afraid that he might do so.  He said his plan was to try really hard not to look at them as it might temp him to hurt them.

39.  After this interview was concluded, I arrested GOLDEN for possession of the child pornography at his home, and attempting to receive and receiving child pornography via the UC Operation.

//

## IV. <u>CONCLUSION</u>

40.   Based upon the foregoing, I believe that there is probable cause to believe that GOLDEN has violated Title 18, United States Code, Sections 2252A(a)(2)(A), (b)(1) and 2252A(a)(5)(B) by knowingly attempting to receive child pornography and possessing child pornography.

<br>

_____

LYNDON VERSOZA
INSPECTOR
UNITED STATES POSTAL INSPECTION SERVICE

Subscribed and sworn to before me

This _31_ day of _2013_ _____
         **MICHAEL R WILNER**

_____

UNITED STATES MAGISTRATE JUDGE